Our first case for argument, Bradford v. Brown, Mr. Safer. May it please the court, my name is Ron Safer. I represent Mr. Bradford. Defense counsel was ineffective in his selection of a fire expert in two independent ways. First, defense counsel selected a fire expert who had no expertise in fire toxicology. Such an expert would have testified that the victim's dog was alive while the fire burned. If the dog were alive in the morning while the fire burned, the state's 65 second timeline does not work. Second, independently, defense counsel failed to call an expert who was qualified to give an opinion on the duration of the fire. If the fire burned longer than eight minutes, Bradford could not have been the arsonist. There is no dispute. Mr. Safer, who should he have called as a witness? He should have called an expert who had expertise in fire toxicology and the duration of fire. Mr. Carpenter testified later in the PCR hearing in the state courts that he was relying on quite a bit of later data in his estimates of the duration of the fire. And it seems as though fire science went through a fairly dramatic improvement and revolution starting right around the time of this trial. So what worries me most about your ineffective assistance of counsel claim, in essence, is that it feels too much like hindsight. So I'd appreciate what you have to say about that. Your Honor, the Indiana Court of Appeals explicitly rejected that contention. That contention was made at the PCR, that this was newly discovered evidence. And the Indiana Court of Appeals expressly rejected that. They said that this was not newly discovered, that everything that Carpenter testified to could have been discerned at the time of trial. They said that although he relied on tests that were done, for instance, the mattress mass loss rate, that could have been done before. And he did testify to that. So we cannot whipsaw the defendant. He is innocent. This evidence proves him innocent. He said that it was newly discovered in the Court of Appeals. They said, no, we can't now say, yes, it was, and keep him in jail for that. Thus, on these critical and exculpatory issues, counsel left his client with no expert. First, the fire toxicology. The bank camera captured Bradford at 634.04, two blocks away from Ms. Lohr's house. He called in the fire at 635.09. There is definitive proof of that. There's no flexibility in the timeline. The state put on evidence that based on an experiment conducted by a detective, that Bradford could drive the rest of the way to the victim's house, park his car, get out of his car, enter the house, splash gas all over Ms. Lohr and the room in which she was, so carefully that he got no gas on himself, splash it on the way out, ignite it, and call in the fire in 65 to 70 seconds. If there was one additional second, he couldn't have done it. I've read Detective Minnis' testimony about that. And I guess I've read some of it. How tight is that? What are you relying on to show that there's not even room, for example, to kill the dog? He performed this experiment once. And he said that the quickest he could do it was 65 seconds. What's he doing, killing a dog? Excuse me, Your Honor? Killing a dog? No, without the dog. That what he could do was drive the rest of the way and get out of his car, splash the gas, light the fire. And he said the quickest he could do it was 65 seconds. That leaves out some things. It leaves out him pausing to wave to the neighbor. Did Lohr have other enemies? She did. She had numerous other enemies. Why is that? One of them was a she. Why had she accumulated numerous enemies? Well, one in particular, Your Honor, she. I'm asking you why she, you say she had numerous enemies. Why? Well, she had made a sexual harassment complaint against one person. And he was fired from his job and couldn't reach his lifelong goal of being a police officer. She had an encounter with another person as a baseball umpire. And he held the grudge. There were a number of specific people who had enacted this person on the section. Did you interview any of those people? The sexual harassment person was interviewed by the police. He had stalked Ms. Lohr shortly before she was killed. He admitted that. He was interviewed in his driveway for a period of minutes in the presence of his wife, who was his alibi. And that was it. So the investigation was always focused on Mr. Bradford. Even though there was. You didn't interview this person. I did not, Your Honor. I do not believe he would talk to me. You do not believe he was what? Talk to me. Well, you could subpoena him, couldn't you? I had no. There was no hearing, Your Honor. I came in. There was no what? No hearing to which I could subpoena him. You couldn't conduct discovery? No, Your Honor. No discovery is available at the level that we came into this case. Speaking of which, Mr. Seyfried, to what extent does your case rely at this point on the evidence from Dr. DeHaan? Not at all, Your Honor. Not at all. So this timeline, Your Honor, there was no room in that. Indeed, Minnis uses up five seconds too much when he conducts his experiment. And the dog, it's not contrary to what the state says, could not have been beaten and killed instantaneously. The evidence is he was beaten. There was bruising around the eye. He was stabbed twice. It could not be done instantaneously. We know that that was done in the morning because the dog had an elevated carboxyhemoglobin rate of 4.2%. Ms. Lohr's was the baseline of 0.2%. And thus, the only explanation was that the dog breathed the byproducts of the fire. We know that the dog died. Well, the dogs are much smaller, so it doesn't take as long for carbon monoxide to flood them. That is correct, Your Honor. But it takes some time. So we know that it was alive during the fire. That means that it was killed in the morning. What is the term used by the Supreme Court and by you occasionally? What does actual innocence mean? It means that it is likely that the defendant did not commit the crime. And that is physically impossible. No, that's not what actual. But then what's the difference between actual innocence and innocence? I don't think there is one, Your Honor. Why do they use the word actual? I'm not sure. Typically, courts have distinguished between so-called legal innocence and actual innocence if there's some discrepancy about whether the charge was correct. But I'd like to follow up on my colleague's questions, Mr. Safer, and ask you, if there is a freestanding actual innocence theory available, we'll get to Herrera in a minute. But if that theory is available, what do you think the appropriate standard is? It has to be high. Yes, Your Honor. I would say it is a preponderance of the evidence or clear and convincing evidence either that the defendant did not commit the crime as opposed to that a jury would find him not guilty. And this is that case. There is definitive proof. But just to be clear, well beyond the Jackson versus Virginia sufficiency of the evidence test. Yes. Going to active rebuttal. Yes. So the fire toxicology proves that he could not have committed this crime. So does the duration of the fire. The key evidence that he needed expert testimony on was the duration of the fire. And he called somebody who had no ability to do that. He called a cause and origin expert. And indeed, the ATF agent who testified for the state about the duration of the fire was not a cause and origin expert and testified that he was not a cause and origin expert. But he did know about duration of the fire. The only analysis that this quote unquote defense expert used was a rule of thumb by the NFPA. That was outdated by 15 months by the time he testified. Both the district court below and the Indiana Court of Appeals said that it was just a few months parroting what the state said and what the state said to this court. That's wrong. It was clear error. And that is wrong. The trial was in May and June of 1993. And NFPA 921 was published in early 1992. Had trial counsel bothered to look at or even ask the expert for his sole basis, for his expert opinion, he would have seen that it was outdated. And he did nothing, much like the attorney in Ritchie. He did absolutely nothing to change that. There are scientific principles and computer models available to counsel at the time of trial. That is the ruling from the Indiana Court of Appeals that he did not use. The top panel of the door charred through when actual experiments, controlled experiments were conducted using proper temperatures. It showed that it had to take 30 minutes, thus eliminating the defendant as the murderer or the arsonist. The mattress was entirely consumed by the fire. That took approximately two hours, eliminating the defendant as the murderer. It's the same with the dog's carboxyhemoglobin level. All of those scientific principles were denied the defendant in this case because of this counsel's choice of a non-expert. And that is why his conviction, he must have a new trial. Do we know how many experts that you believe would fit your requirements? Many, Your Honor, many. I mean, how do we know that? Well, we know that the state had experts who testified in the duration of trial. Mr. Carpenter was available at the time. Mr. Carpenter testified that others found this. And again, the Indiana Court of Appeals said that all of this information was available at the time of trial. Why did the murderer stab the poodle? Why did the murderer? Stab the poodle. Stab the poodle? I don't know. But he likely did it around the same time that he conducted the murder, that he committed the murder. Keep in mind, Your Honor, that the murder and the arson were probably done around the same time. The state manipulated the time of death to fit the window of opportunity, not to fit the evidence. The autopsy report said that she was killed two to three hours before the fire. And that would have eliminated Mr. Bradford. And once that became clear that that would have eliminated Mr. Bradford, he extended that time. So probably he- Were there multiple autopsy reports? There were not. He just extended it on the stand. On the stand? Yes. And in his deposition as well. Why would someone murder a person and then two hours later set the house on fire? Probably, Your Honor, murdered her, staged the burglary, which took some time, turned off the wires to manipulate the phone wires, did a number of things, pushed out the window, all of which took a lot of time, and then set the fire. Does it take two hours to do those things? It certainly could. He did a lot of things. He manipulated the window. He put a ladder outside. Does it take two hours? But Carpenter testified, though, that the fire could have burned for as long as a couple of hours before it basically burst out. Absolutely. And that's true as well. So he could have done all- take all of those things, done that, the fire burned between 30 minutes and two hours, according to the expert testimony. Can I follow up, though, on a few factual matters, Mr. Safer? On the dog's carbon monoxide blood levels, at least as I understand that testimony, it seems to imply that the dog was alive for about 30 minutes during the fire, right? Yes. Which suggests to me, then, that the- at least if you accept the state's veterinarian autopsy report, that the murderer stuck around. Yes. For quite a while after the fire got started. Yes. That seems very probable. It doesn't, Your Honor, because the fire- first of all, the fire, as the testimony was, ignites with a big whoosh, but then calms down. He is in the room next to the fire. And that is where the dog is killed. That is where the pool of blood is. So I think he waits. 20 minutes? I think so, Your Honor. Or is the veterinarian just wrong about how long the dog survives? Either way, the veterinarian testified that it's very hard to pinpoint a time and that he was giving a guesstimate. These may sound like random questions. Not at all. But I'm sorry. There apparently was an 11-year delay in this case, according to your- was that in the PCR stage? Yes. Can you explain to us what was going on there? How that happened? I do not know, Your Honor. The PCR was filed in 2000, is that right? It was. And you didn't get a hearing until 2011? Or this was through the Indiana Public Defender's Office? Yes, Your Honor. And I do not know why. OK. If I could just trouble you about a few more things. I guess with focusing on Carpenter's testimony, which seems to me like the foundation of your case, is there any physical or testimonial evidence presented at trial that Carpenter, in essence, has to reject, that he can't explain away? I'll have the same question for the State. There is none. Zero. He accepts all of it. OK. And could you speak briefly to how sensitive Carpenter's opinion about the duration of the fire was to changes in some variables like thickness of the door panel, the particular specifics of the mattress that burned, and so on? They were not sent to- How far open the door was and so on? Your Honor, he testified that he accounted for a number of variables. He accounted both for a range in temperature. That's how he gets from 30 minutes to two hours about the door. And the thickness of the door as well. He uses the thickness of the door from doors actually at the scene. So there's no reason to believe that's inaccurate. But still, there's a lot of room for error on that. With regard to the mattress, he knows what the mattress is made of. He accounts for a difference in ventilation. And he says that that mattress would have taken two hours to be consumed with no ventilation and somewhat less with a little ventilation. So it's got a lot of room for error, Your Honor. One of the factors that the state's expert relied upon in trial for his opinion that the fire was very hot and very short was limited damage to some of the denser materials in the bedroom, computer desk, cedar cabinet. Did Carpenter address those and account for them? I don't recall whether he addressed it, Your Honor. But that is one of the many fallacies in the fire. This is a ventilated, controlled fire. And thus, the damage was going to happen towards the ventilation. The computer desk was away from the ventilation. And it was one of the many things that the experts got wrong and then just plucked out of thin air a seven to eight minute duration. Thank you. OK. Thank you, Mr. Sagan. Mr. Flores. May it please the court. First, with respect to Your Honor's question regarding testimony that Carpenter would have had to have rejected, he did reject the veterinarian's testimony. The veterinarian. About the length of time the dog would stay alive. That's correct. At trial, the veterinarian testified that the dog would have succumbed to its stab wounds within five to six minutes. Would have made it possible for the dog to have died while the fire was set. And with respect to the timeline, the lead detective in this case timed it pursuant to the facts that Bradford gave to the police. Well, he did both. He did both. Well, correct. He tested Bradford's version. And then he tested his own hypothesis that it was Bradford who set the fire then, right? Correct. But Bradford had said that he crawled into the house. So that's how it was tested. At the scene, he couldn't crawl, the detective, because there was insulation on the floor. So he measured the distance, and then he crawled it. So the timeline of the 65 to 67 seconds was based on Bradford crawling. No, no, no, no, no, no. No, it's not. I mean, you've got two different versions, right? You've got Bradford's version, which is he arrives at the house, discovers the fire, tries to crawl into the bedroom, can't get there, comes back out, et cetera. And you've got the police criticizing him because he didn't call 17 seconds earlier, according to his version of Detective Minnis' test. You've got the entirely different test Minnis did, which is the hypothesis for the state's case as to how they think Bradford committed the crime, right? Correct, yes. With the red light as well. That's correct. Yeah, OK. Yes. So there, I mean, it's still possible for this dog to have been, with respect to the dog, the dog evidence was excluded by the district court based on Cullen v. Pinholster. It was never presented on direct appeal. Any evidence regarding the dog. It was part of the PCR case, though, right? Correct, with respect to. She didn't consider the dog evidence on sufficiency of the evidence, right? That's correct. But it's still highly relevant with respect to the ineffective assistance of counsel claim. And it's part of the state court record. That's where I was reading it. That's correct. And it's been the state's petition below that petitioner has never made a claim in his post-conviction brief, and we made this claim in the district court as well, that he's never presented a claim that counsel was ineffective for failing to select an inhalation toxicology expert. And it's still our position here. Now, with respect to the differences in experts, Carpenter was a mechanical engineer by trade. Davey was a chemist. He had a degree for chemistry. Carpenter criticized the length of the fire primarily because of the lack of ventilation due to the position of the door, approximately one inch, because there was a hanger with clothes on it preventing the door from closing all the way. So there was a one inch gap. When Carpenter conducted his experiments, he didn't account for the door moving during the fire. He conducted his experiments in a controlled environment, the same type of controlled environment that the petitioner is now criticizing Davey for relying on. And with respect to this NFPA 921 bulletin with this one inch. Sorry, is it your theory that the door opened on its own and closed again during the fire? No, that's not my theory at all. My theory is that there's not a theory about fire. This is just with respect to experts. Carpenter was conducting controlled experiments in a laboratory setting. The same type of analysis that Davey relied on and the same thing that he's now criticizing for why he wasn't a potential expert, why he should not have been. Davey's didn't do tests on the char through on the mattress, et cetera. Look, if innocence matters, how does the state explain the time needed for the mattress to be consumed and the dog's carbon monoxide levels? We rely on the evidence that was introduced at trial, your honor. Well, look, maybe I missed something, okay? Carpenter provides a pretty detailed and at least on first reading pretty persuasive report in the cross-examination of Carpenter in the PCR hearing. I didn't see a glove laid on that. I'm sorry, excuse me. I didn't see any significant impeachment or impairment or substantial criticism of Carpenter's analysis. And given that, this becomes a pretty powerful case for the petitioner. What did I miss? I would disagree, your honor. With respect to the expert here, what petitioner is asking this court to do is weigh the qualifications of the experts, if you will, and say that Davey was a more, excuse me, Carpenter was a more qualified expert and that's why. No, the argument is that one had a relevant opinion and the other did not. Davey's opinion about duration of the fire was based on two factors. One, the testimony from the paper deliverers, which any juror could figure out that conclusion. And the other was the char through time from the door panel where he's relying on outdated, discredited rules of thumb. What else is there? With respect to Davey's testimony, the 921 bulletin by NFPA, it's a cautionary rule that you're not to rely on this one inch rule in isolation. And Davey didn't do that. Davey relied on the effect the accelerant would have on the fire, the effect that the scuttle to the attic, the door right outside out, the access panel to the attic that was right outside the door, how that would have on ventilation, the amount of consistency of smoke, and then he determined that it was not a real hot fire because there was no heat damage and just smoke in the attic area. He relied on a number of factors and just not this NFPA 921S petition would have. Was he wrong? Was Davey wrong then? I would disagree that he was wrong. He gave the same conclusion that Carpenter did, that Bradford's statements to the police were consistent with the conditions of the fire. Carpenter merely packaged the conclusion in a different manner. That's a very interesting criticism of somebody who, in essence, does experiments, checks the data on the carbon monoxide levels in the dog, on the mattress consumption, and on the temperature of the fire based on the glass breakage. That doesn't sound to me like just repackaging. I would respectfully disagree. All right. What does someone have to show in order to get a new trial, new circumstance? Struggling with the notion of what actual innocence means. Well, I don't know if the Supreme Court of the United States has yet announced a standard here. We have the Shultz standard for excusing procedural default for a miscarriage of justice standard. And there, the court noted that that would require- You're not answering my question. What do you think someone like Bradford has to prove in order to get a new trial? This would be extraordinarily high, as the court said in Herrera. You have to be more specific. What does he have to prove? It's greater than beyond a reasonable doubt since he's already been convicted by a jury. Greater than beyond a reasonable doubt? Yes, Your Honor. Or a certainty? Prove a certainty? What's above beyond a reasonable doubt? With certainty that you are innocent. Pardon? With certainty that you are innocent. Courts have looked at this recantation testimony has not been found to be enough. Okay, he has to prove to a certainty that he was not the murderer. Is that what you're saying? That would be correct. Prove to a certainty. Okay. And I mentioned physical impossibility and your opponent just dismissed that. That's not an aspect of this? Physical impossibility, in other words, just not physically possible that he could have done it? He would have to show that to succeed on a freestanding actual innocence claim. That would be our position, yes. And he can't show that in this case. Well, that was my point. Judge Bozner was asking about what is actual innocence and physical impossibility would be actual innocence. I would agree. But here, at most, we have conflicting evidence with respect to this freestanding actual innocence claim, which has never yet been recognized. Conflicting evidence with regarding the fire science and we have inconsistent statements by Bradford. Bradford's own statements and inconsistencies to the police like Koops is what assuredly convicted him in this case. Well, here, it's all opinion, though. It's not, there's no way, for example, these timeframes of driving and so forth are estimates at best. That's correct, Your Honor. So here, he just cannot show, based on the evidence and even this new evidence that he's presented in habeas review, that he could establish a viable claim under an actual innocence claim. What is the most recent evidence in the case? Following up on- The most recent evidence? Pardon? The most recent evidence in this case would be petitioner's third fire expert, which would be Dr. DeHaan, that he- I'm asking when. What is the latest, when was the latest evidence in this case? It would have been when it was submitted in 2015 when they submitted their habeas petition. They submitted their report from Dr. DeHaan. But did Davey and Carpenter, did they go back to the original trial, or what? Correct, yeah, we're on, yes, on habeas. All the way back to the trial. Davey is the original trial expert for the defense. Carpenter testified in the post-conviction review hearing in 2011, correct? Correct, and then we have DeHaan that was submitted to support his actual innocence claim, which, interestingly enough, he didn't present a freestanding actual innocence claim to the district court. He conceded to the district court that his actual innocence claim was submitted to excused procedural default on a number of claims. And here, with respect to those claims that were procedurally defaulted, the district court reviewed them anyway de novo. Which, I have to say, made for some rather odd reading. I understand why the district court did it, but to read this entire opinion on the assumption that Mr. Bradford has proven his innocence is a little surreal. But let me ask you, how does the two-visit theory of the midnight murder followed by the 6.30 a.m. arson with routine police patrols in the middle, how does that make any sense? It's based on the evidence that we accumulated below. We have Bradford's car witnessed in the driveway at approximately 11 p.m. You have a police car, Mark. There, right? I think, with regards to Jackson V, Virginia, this court has to assume that facts in the record of this court... What did the witness testify? What, I'm sorry? What did the witness testify? That she saw a police car in the driveway. And there was also evidence that... That he saw what in the driveway? You don't speak very clearly. They saw what? A police car was in the driveway at approximately 11 p.m. A police car? Yes. All the police officers of the Evansville Police Department were given a questionnaire and all denied being in the driveway, which leads to the conclusion to the jury that this was Bradford's car in the driveway. He's saying a police car leads out... Was it a marked police car? It was a marked police car. That is correct. Was the witness asked whether it was a sheriff's car? I don't believe so, Your Honor. Or whether it was... I mean, some people distinguish. Those of us familiar with courts will pay attention to that. Not everybody does. Correct, no. Okay. But I just... And then... It is a very strange theory. And that his whereabouts were undisclosed from 11.07 p.m. to, I believe, a little after midnight. And then at 6.34 in the morning, he's seen passing the bank. And then as lead detective Minnis testified to the events after that. And then we also have multiple witnesses, including three firefighters, who passed the scene at approximately 6.30 and saw no smoke. We have one witness... Who saw no smoke coming from the victim's house, which is contrary to what the defendant said. But was Bradford seen again? Bradford was seen on the street at a bank camera, which was approximately, I believe it was 17 seconds away from the house. And he testified that he could see smoke, or he told police he could see smoke. Well, now, wait a second. Bradford was seen when, what time? At 6.34. In the morning. But the previous evening, the police car in the driveway has not definitely been identified as his. I would... But you were saying process of elimination, all the other officers denied it was their car. Correct. Of course, none of them are suspected, are they? I don't believe they were, Your Honor, no. So presumably, if they said they weren't there, they weren't there. And that was the evidence introduced at trial. But taken most favorably to the verdict, it was Bradford's vehicle. And then Bradford testified to the police that he could see smoke bellowing, translucent gray smoke bellowing from the house as he was turning the corner from the bank, which is contrary to the nine or 10 witnesses that testified at trial that there was no smoke, or they noticed no smoke around that time. That was a few minutes earlier, though, correct? There were some a few minutes earlier, and there were some witnesses that were after. Who were you relying on after this? I believe it's Lofton was his neighbor. And as Bradford pulled in the driveway, he waved to Bradford, or Bradford waved to him, and he didn't smell or notice any smoke at that time period. Okay. Because the carpenter theory is you've got this confined fire in the bedroom, right? Correct. And then once that door chars through, the panel opens up, burst of ventilation, smoke and heat are gonna be able to escape, and then you're gonna get the billowing, right? Correct. That's his theory. Both Dave and Carpenter's, that the smoke would have not been readily apparent until there was more ventilation in the room. Okay. I see my time is up. Are there any further questions? Okay. Thank you. If I could just ask one, what does the state do with the fact that Bradford's uniform had neither blood nor gas when it was tested? It also had no carpet fibers on it, Your Honor, which I think supports- It had no what on it? No carpet fibers. Carpet what? Fibers. Fibers. Yes. No, Bradford testified that he crawled into the house when he arrived and he could not get into the room. He also testified- Okay, that's interesting, but could you go back to my question about gasoline and blood? Right. He had no opportunity to change at least after the fire, right? I would agree. So how does this happen with this sprint around the room to splash gas all over the place and he doesn't get any on his uniform? There was testimony at trial that Bradford's uniform was not presented to the carbon sniffer or the hydrocarbon sniffer until approximately six hours and that gasoline could have dissolved at that time. How sensitive is the sniffer? I'm sorry? How sensitive is the gas- I couldn't answer that question, Your Honor. But with respect to the carpet fibers, that goes to the state's theory of the case, that Carpenter, or excuse me, Bradford did not crawl into the house as he claims he had done. Thank you, Your Honor. Okay, well, thank you, Mr. Flores. You're safer. You have another minute. Thank you. With regard to the gas, Mr. Bradford was with police officers immediately after the fire in a contained vehicle. They all testified there was no smell of the gas. With regard to fibers, he's walked around for periods of time, but there's no evidence that fibers would have survived that. Indeed, when you collect fibers, you have to do it very carefully. With regard to- Do you accept that he was there the evening before? No, Your Honor. With his car? Oh, yes, Your Honor. He was there from 10 o'clock to 10.20, so his car was there. What was he doing there? He visited Ms. Lohr. He was what? He visited Ms. Lohr, the victim. He visited the victim. He visited her? Yes, he visited her. That's undisputed. His car was in the driveway at that time, and after that, but he left. She was alive. She talked to her father for about 40 minutes on the phone. So that his car was there is undisputed. What is disputed is the amount of time. The witness who says that his car was there- What did she say to her father? They had a pleasant conversation, and then she said somebody was at the door at a time, by the way, when Mr. Bradford is indisputably gassing up his car, and the time that the witness says that his car is in the driveway, he is indisputably gassing up his car. This fellow who you said was a possible murderer, the one who had had some problem with her, does he have a criminal record? No, Your Honor, he doesn't, but he was stalking her shortly before this incident. Your Honor, Judge Keeney, I wanted to address one thing that Your Honor had said. You said that the driving, et cetera, was estimates. What is not an estimate, what is indisputable, is that he only had 65 seconds to conduct all of these activities. There's no estimate about that, and the Minnis experiment was not him crawling. It was him walking. It was not an estimate based on the camera? Yes, yes, and that was synchronized by the state. Now, and the Minnis experiment was not, as the state just said, that he was crawling. The record at 25.73 to 74 and 25.77 says that he walked there. The state just said that what 921 said was don't use that in isolation. That is flat out wrong. What it says is, quote, should not be relied on to determine the duration of burning. It is, whatever the standards, Your Honor, this is the case. He is indisputably innocent. He could not have committed the crime. So you want a new trial. That would be in 2017. That's 24 years after the first trial. How are you gonna have a trial 24 years later? Any witness who is not available, Your Honor, their testimony can be introduced to a jury. The testimony can be read to a jury. We can now have a trial. You're gonna have two records. You're gonna have the record of the first trial and then whatever record is created in the second trial. You would read with unavailable witnesses testimony to the jury, yes, and now today we could have a trial based on science that we know is true, that we know is correct, and that record could be established and a man's innocence can be tested. This man was indisputably. I don't think that's true, actually. And you certainly haven't shown it. Your Honor, Mr. Carpenter was, as Judge Hamilton said, was not touched. He was, there was no evidence in rebuttal to it. It is scientifically proven, experiments, physics, chemistry. This man is innocent and he deserves a right to have a trial based on that testimony. Okay, thank you, Mr. Sageman. Thank you, Your Honor. Mr. Flores.